■ MITCHELL E. DRYER JR. et al., Respondents, v MICHAEL F. MUSACCHIO JR., Individually and Doing Business as CITY LANES LLC, et al., Appellants, et al., Defendant. [985 NYS2d 302]—

---

Egan Jr., J. Appeal from an order of the Supreme Court (Mc-Dermott, J.), entered September 12, 2012 in Madison County, which, among other things, partially denied certain defendants' motions for summary judgment dismissing the complaint against them.

During the early morning hours of April 22, 2007, plaintiff Mitchell E. Dryer Jr.—a firefighter employed by the City of Oneida Fire Department in Madison County—responded to a structure fire at City Lanes bowling alley. The property in question was owned by defendant Paul Manaseri and leased to defendant Michael F. Musacchio Jr. pursuant to the terms of a rent-to-own agreement. Upon arriving at the scene, Deputy Chief James Dowd observed light smoke coming from the roof of the bowling alley. At this point, the fire was in what Dowd described as "its incipient stage," meaning that "[n]o fire had broken out anywhere." Dowd entered the structure through the main doors, walked to the spectator area and attempted to locate the source of the fire. Although Dowd observed smoke "up high" beyond the spectator area and could hear the "pinsetters at the other end of the bowling alley operating," he "felt no heat." Dowd then exited the structure, advised Lieutenant Robert Cowles that he could not find an obvious source for the fire and instructed Cowles—armed with an infrared camera—and Dryer—carrying a hose line—to enter the building and "see if they could find anything." Dowd then walked to the rear of the bowling alley to determine whether the fire was located in the pin setting area. Assisted by additional personnel, Dowd broke down a door at that location and entered the building, where he encountered moderate smoke but, again, no heat or fire. Shortly after exiting the building, Dowd heard a "mayday" call over his radio.

In the interim, Dryer and Cowles entered the bowling alley and attempted to locate the source of the fire. When the two reached the end of the entrance hallway, Cowles "knelt down and did a six-sided scan with the thermal imaging camera," which "revealed no fire, thermal layering or thermal convection in this area." Like Dowd before him, Cowles could hear and, through the thermal imaging device, see the pinsetters operating at the end of the bowling alley. Cowles radioed his results to

Dowd and, as the hose line that Dryer was carrying was not yet charged with water, he and Cowles walked back toward the main entrance. Once the line was charged, the two reentered the structure and, using a Halligan tool, forced open a door and entered the bar area. After scanning that area for fire, Cowles and Dryer again entered the bowling alley proper and continued to search for the source of the fire.

Using the thermal imaging device, Cowles located a small pile of burning debris, instructed Dryer to extinguish it and radioed Dowd that they "were checking the ceiling for extension." Using the Halligan tool, Cowles removed a ceiling tile from the drop ceiling in this area and scanned for heat. At first, Cowles "found nothing," but as he continued to remove ceiling tiles, he "noticed a small area of fire . . . and told [Dryer] that [they] had a fire in the ceiling." Dryer opened the hose line and directed it at the ceiling while Cowles, standing approximately three to five feet away, continued to scan with the imaging device. As Cowles later recounted, "Just then the screen lit up and a large amount of fire was visible through the screen." As Cowles stepped toward Dryer, a large portion of the ceiling collapsed on top of them. Cowles was knocked down and back several feet from where he had been standing; unsure as to the extent of the collapse, Cowles transmitted a mayday call on his radio. After he freed himself from the debris, which was piled three to four feet deep, Cowles found himself in the midst of an "inferno." Cowles called out to Dryer, who briefly cried out for help, and Cowles immediately began digging in the direction that he had last seen Dryer. Although Cowles was able to unearth the hose line that Dryer had been holding, the volume of debris, which included portions of the roof, was too much for Cowles to move on his own. Cowles then exited the building and advised that Dryer was trapped inside.

In response, Dowd entered the bowling alley with Cowles in order to ascertain Dryer's approximate location. According to Cowles, conditions inside the structure "were rapidly getting worse," and it was "noticeably hotter than when [he had] exited just a few minutes before." Upon surveying the scene, Dowd noted that the second floor of the building had collapsed into the spectator area of the bowling alley, resulting in a debris field measuring approximately 12 feet by 40 feet with a depth of four to six feet. Dowd also observed an "immense amount of fire" in this area and could see a portion of the hose line that Dryer had been carrying running underneath the debris field; he did not, however, hear Dryer's Personal Alert Safety System (hereinaf-

ter PASS) device sounding.[1] In response, Dowd exited the building and devised a rescue plan, which included sending firefighters into the bowling alley, showing them approximately where Dryer was believed to be located and instructing them "to knock [down] as much fire . . . in that area" as they could. Approximately 20 to 26 minutes later, firefighters—digging mostly by hand—were able to extract Dryer from the rubble.[2] As a result of the collapse and ensuing entrapment, Dryer sustained serious injuries—including severe burns and the loss of his right arm.

Dryer and his spouse, derivatively, thereafter commenced this action against, among others, Musacchio, Manaseri and defendant Scott Technologies, Inc. (the manufacturer of the PASS device) pursuant to General Municipal Law § 205-a and General Obligations Law § 11-106 and setting forth causes of action sounding in negligence and strict products liability.[3] Following joinder of issue and extensive discovery, the owners moved to dismiss plaintiffs' General Municipal Law § 205-a claim for failure to state a cause of action and for summary judgment dismissing the complaint against them, and Scott Technologies moved for summary judgment dismissing the complaint. Plaintiffs opposed the respective motions, cross-moved for certain relief not relevant here and submitted a proposed second amended summons and complaint. Supreme Court, among other things, granted the owners' respective motions for summary judgment dismissing plaintiffs' General Obligations Law § 11-106 cause of action but, as to plaintiffs' General Municipal Law § 205-a claim, denied the owners' motions for summary

---

**1.** The PASS device, which is integrated into a firefighter's self-contained breathing apparatus, emits "three quick audible chirps"—and a green LED light begins to flash—when the air circuit on the breathing apparatus is opened. If the device does not detect motion for approximately 20 seconds, "it will go into a pre-alarm mode, signaled by a two-tone audible chirp and a flashing red LED." If, after another 10 seconds, the device is not manually deactivated or does not detect motion, it goes into a full-alarm mode and emits "a really loud alarm with flashing lights," designed to assist firefighters in locating immobilized colleagues. According to Dowd, Cowles and "pretty much everybody" that was involved in Dryer's rescue "commented that they never heard [Dryer's] PASS alarm go off" that morning.

**2.** Although a chain saw was available for use, Cowles testified at his examination before trial that the firefighters did not use this tool because, "not knowing [Dryer's] location," they were afraid that they would injure him.

**3.** Insofar as is relevant here, plaintiffs commenced this action against Manaseri (individually—as the owner of the premises—and doing business as Oneida City Lanes, Inc.), Musacchio (individually—as the tenant—and doing business as City Lanes LLC), City Lanes LLC and Oneida City Lanes, Inc. As the interests of these defendants are closely aligned, they will—unless otherwise noted—collectively be referred to as the owners.

judgment, denied the owners' motions to dismiss for failure to state a cause of action and granted plaintiffs leave to serve an amended complaint. Supreme Court also denied the owners' motions for a bifurcated trial. Additionally, Supreme Court denied Scott Technologies' motion for summary judgment in its entirety, finding a question of fact as to whether Scott Technologies was aware of prior instances in which the PASS device failed to perform—resulting in firefighter injuries or deaths— and thereafter failed to take corrective action and/or warn the owners of such devices. These appeals by the owners and Scott Technologies ensued.

We affirm. Initially, we cannot say that Supreme Court abused its discretion in denying the owners' motions to dismiss and granting plaintiffs leave to serve an amended complaint. General Municipal Law § 205-a creates a statutory cause of action for firefighters who are injured in the line of duty "directly or indirectly as a result of any neglect, omission, willful or culpable negligence of any person or persons in failing to comply with the requirements of any [federal, state or local] . . . statutes, ordinances, rules, orders and requirements" (General Municipal Law § 205-a [1]; *see Zanghi v Niagara Frontier Transp. Commn.*, 85 NY2d 423, 441 [1995]; *Monahan v 102-116 Eighth Ave. Assoc., L.P.*, 85 AD3d 879, 880 [2011]). "To fall within the protective scope of the statute and defeat a motion to dismiss, a plaintiff seeking recovery under General Municipal Law § 205-a must identify the statute or ordinance with which the defendant failed to comply, describe the manner in which the firefighter was injured, and set forth those facts from which it may be inferred that the defendant's negligence directly or indirectly caused the harm to the firefighter" (*Zanghi v Niagara Frontier Transp. Commn.*, 85 NY2d at 441; *see Hanlon v Healy*, 98 AD3d 1304, 1304-1305 [2012], *lv dismissed* 21 NY3d 885 [2013]; *Clarke v Drayton*, 83 AD3d 762, 762 [2011]).

As Supreme Court duly noted, plaintiffs' proposed second amended complaint fell short of this standard. That said, plaintiffs' supplemental bill of particulars set forth the particular provisions of the Uniform Fire Prevention and Building Code (*see* 19 NYCRR 1219.1) alleged to have been violated by the owners, and plaintiffs' delay in seeking the proposed amendment was excusable given that the bowling alley had been demolished by the time they retained an expert—thereby inhibiting their investigation into the cause and origin of the fire. Further, it is readily apparent from the record that plaintiffs' theory as to the cause of the fire—namely, ongoing electrical problems in the building and the owners' use of power

strips and extension cords—was well known to the owners and was fully explored during the discovery process, thereby demonstrating a lack of prejudice with respect to the proposed amendment (compare Secore v Allen, 27 AD3d 825, 829 [2006], with Bailey v Village of Saranac Lake, Inc., 100 AD3d 1089, 1090-1091 [2012], lv dismissed 20 NY3d 1053 [2013]). Under these circumstances, we discern no abuse of discretion in Supreme Court's decision to deny the owners' motions to dismiss and grant plaintiffs the requested amendment—notwithstanding the fact that the note of issue had been filed (cf. Torres v New York City Tr. Auth., 78 AD3d 419, 419-420 [2010]).

Nor are we persuaded that Supreme Court erred in denying the owners' motions for summary judgment dismissing the General Municipal Law § 205-a cause of action. In this regard, the owners bore the initial burden of establishing either that they did not violate any relevant governmental provision or, if they did, that such violation did not directly or indirectly cause Dryer's injuries (see Giuffrida v Citibank Corp., 100 NY2d 72, 82 [2003]; Monahan v 102-116 Eighth Ave. Assoc., L.P., 85 AD3d at 880; Donna Prince L. v Waters, 48 AD3d 1137, 1138 [2008]). The "directly or indirectly" language employed in General Municipal Law § 205-a "has been accorded broad application by the courts, 'in light of the clear legislative intent to offer firefighters greater protections' " (Cusumano v City of New York, 15 NY3d 319, 325 [2010], quoting Giuffrida v Citibank Corp., 100 NY2d at 80).

In support of their motions for summary judgment, the owners tendered, among other things, the investigative reports and/or examination before trial testimony of Dowd, fire investigator Daniel Vieau, forensic electrical expert Howard DeMatties and Office of Fire Prevention and Control investigator Richard Daus. Vieau concluded that the fire originated in a second-floor storage area (formerly used as a movie theater projection booth) and that the fire was incendiary in origin. Vieau's conclusion in this regard was based, in part, upon DeMatties's "eliminat[ion of] any potential electrical ignition source within the second[-]floor storage area." Following his investigation of the fire, Dowd issued a preliminary report wherein he also concluded that the fire originated in the upstairs projection booth and was incendiary in origin. Specifically, Dowd ruled out "all other possible fire causes" and "determined that this fire was not accidental in origin." Daus reached a similar conclusion, noting that "the fire damage was found to be consistent with a fire that originated in the loft section of the . . . structure most specifically above the area which spanned the bar and of-

fice." As to the cause of the fire, Daus observed that "[t]he damage to the electrical wiring was found to be consistent with exposure to fire and not with a fire originating as the result of an electrical problem"—noting that "no accidental or natural fire cause was found." Such proof, in our view, was sufficient to discharge the owners' initial burden on the motions for summary judgment.

In opposition, plaintiffs relied upon the affidavit tendered by their expert, Ronald Ryan, as well as the photographic evidence and examination before trial testimony documenting the various extension cords and power strips observed at the fire scene, the owners' past history of code violations in this regard and the owners' acknowledgment of prior electrical issues at the bowling alley. Specifically, Ryan opined that "the fire started in the office area [of the bowling alley], including the area within the walls and drop ceiling, [and] that the actual ignition of the fire developed slowly, as a result of overheating electrical components, over a period of hours, during which time it went undetected." Ryan further was of the view that, "[o]nce open flame developed, the fire spread vertically in the wall and into the area between the drop ceiling and the floor of the second[-] floor structure, [at which point] it . . . continued to burn upward and outward . . . , consuming the wooden floor and support members of the second[-]floor projection room, subsequently compromising the structural integrity of the second floor and ultimately contributing to its collapse." Ryan's opinion in this regard was predicated upon, among other things, "the extremely fire-damaged condition" of—and the distinctive burn patterns present on—certain of the walls in the office, all of which, in his view, were "consistent with the area of origin being the office." The absence of any incendiary devices or accelerants at the scene—coupled with the documented "daisy-chained power strips and extension cords [found] within the office"—led Ryan to conclude that "the cause of the fire was electrical, most likely originating in the office, related to the improper use of power strips and extension cords, inadequate and overloaded electrical circuits, together with pre-existing electrical issues related to the circuits leading into and out of the office."[4] To the extent that the owners deem Ryan's affidavit to be conclusory and generally insufficient to defeat the

---

4. On this latter point, Ryan pointed to prior code violations regarding such devices and Dowd's testimony regarding the operation of the pin setting machines on the night of the fire, evidencing what Ryan characterized as "unusual electrical activity since the bowling alley was closed and [the] switches for the machines [were] noted to be in the off position," as well as

underlying motions for summary judgment, we disagree. Ryan expressly referenced the various reports, documents, photographs, statements, testimony and other materials that he reviewed in rendering his opinion (*see Doucett v Strominger*, 112 AD3d 1030, 1033 [2013]; *compare Jones v G & I Homes, Inc.*, 86 AD3d 786, 788-789 [2011]) and, viewing such evidence in the light most favorable to plaintiffs (*see U.W. Marx, Inc. v Koko Contr., Inc.*, 97 AD3d 893, 894 [2012]), we are satisfied that plaintiffs raised a question of fact as to the cause and origin of the fire, thereby warranting denial of the owners' respective motions.

We reach a similar conclusion with regard to Scott Technologies' motion for summary judgment dismissing the complaint. "In order to recover in a strict products liability action, the plaintiff must prove that the defendant manufactured for sale, or sold, distributed, leased, or otherwise marketed a product, that the product was defective, that the plaintiff was injured and that the defect was a substantial factor in causing the [plaintiff's] injury" (*Fisher v Multiquip, Inc.*, 96 AD3d 1190, 1191 [2012] [internal quotation marks and citation omitted]). The requisite defect, in turn, may stem from "a manufacturing flaw, improper design or failure to warn" (*id.* at 1191-1192 [internal quotation marks and citations omitted]).

Although Scott Technologies does not concede that the PASS device worn by Dryer—the Scott Pak Alert SE+—was defective, its argument on appeal centers around the "substantial factor" element of plaintiffs' products liability claim. Specifically, as so limited by its brief, Scott Technologies contends that Supreme Court erred in denying its motion because every rescuer knew of Dryer's location within the debris field—hence, the alleged defect in the PASS device did not hinder the rescue—and, further, that there was no evidence that the alleged defect caused or exacerbated Dryer's injuries.[5] Assuming, without deciding, that Scott Technologies discharged its initial burden on the motion for summary judgment in this regard, the proof tendered by plaintiffs in opposition was more than sufficient to raise a question of fact with respect thereto. Accordingly, Scott Techolo-

---

Musacchio's examination before trial testimony wherein he referenced certain circuit breakers that would routinely "trip."

**5.** Scott Technologies also argues that plaintiffs failed to demonstrate that it was feasible to design the PASS device in a safer manner (*see Voss v Black & Decker Mfg. Co.*, 59 NY2d 102, 108 [1983]). However, as the party seeking summary judgment, Scott Technologies bore the burden of demonstrating the *absence* of a safer but functionally equivalent design (*see Yun Tung Chow v Reckitt & Colman, Inc.*, 17 NY3d 29, 35-36 [2011] [Smith, J., concurring]), which it failed to do.

gies' motion for summary judgment dismissing the complaint was properly denied.

As a starting point, the record plainly reflects that—at best—the firefighters involved in Dryer's rescue had only a general idea as to his approximate location within the debris field—an area that, as noted previously, measured approximately 12 feet by 40 feet and was roughly four to six feet deep. In this regard, Dowd testified at his examination before trial that Cowles "showed [him] approximately where [Dryer] was located" within this expansive, burning debris field; although Dowd could see a portion of the hose line that Dryer had been holding extending beneath the debris field, he did not know where that line terminated. Similarly, Cowles testified that he did not see—relative to Dryer's initial position in the structure—the direction in which Dryer was propelled following the collapse, nor was he able to ascertain Dryer's position relative to the portion of the hose line that was visible. For this reason, Cowles testified, he opted not to use the available chain saw to cut through the debris for fear of injuring Dryer. None of the firefighters present heard the alarm sound on Dryer's PASS device, and Cowles testified that, had the alarm been "going off, . . . it would [have] allow[ed him] to hone in on [Dryer's] location better." Similar testimony was offered by firefighter Dennis Fields, who testified that a functioning PASS device "would have made it easier . . . to find [Dryer's] exact location." When asked to elaborate as to how the alarm from the PASS device would have aided in the rescue, Fields explained, "I wouldn't have been searching around looking for [Dryer]. I would have known where to go, at least a closer vicinity of where he was." In light of such testimony, plaintiffs have raised a question of fact as to whether the alleged defect in the PASS device worn by Dryer on the morning in question hindered his eventual rescue.

We reach a similar conclusion with respect to whether the alleged defect in the PASS device was a substantial factor in causing or exacerbating Dryer's injuries. Although plaintiffs indeed will be required to tender more specific proof at trial, the anticipated testimony of plaintiffs' expert medical witness, Guillermo Quetell, together with the affidavits submitted by Jeffrey Stull and Charles Soros, are sufficient to raise a question of fact as to, among other things, whether the delay in extracting Dryer from the burning debris field exacerbated his resulting injuries. In this regard, Stull, an engineer and an expert in the field of personal protection equipment, averred that the "failure of the PASS device to function as intended caused or contributed to the severity of . . . Dryer's burn

injuries, as during the entire time of attempted location and rescue, he was covered in hot and/or burning debris and exposed to water that was also becoming heated, thereby, over time, enhancing and increasing the severity of his burn injuries." Soros, a career firefighter and consultant, similarly averred that, because "the degree of burn injuries are well known to be caused by a function of both heat and time, any delay in rescue and removal from the heat source would be considered to be a contributing factor." In Soros' opinion, had Dryer's PASS alarm sounded, Dryer "would have been extricated in significantly less time than the 20 to 26 minutes that has been estimated to be the time from collapse to rescue, and that therefore, the severity, nature and extent of his burn injuries would have been greatly reduced." Under these circumstances, a question of fact exists as to whether the alleged defect in Dryer's PASS device was a substantial factor in causing or exacerbating his injuries. Accordingly, Scott Technologies' motion for summary judgment dismissing the complaint was properly denied. The remaining arguments advanced by the owners and Scott Technologies, including the owners' assertion that Supreme Court erred in denying their request for a bifurcated trial, have been examined and found to be lacking in merit.

Lahtinen, J.P., McCarthy and Garry, JJ., concur. Ordered that the order is affirmed, with costs.